ace

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 06-40103-JAR |
| ) | |
| FRANK JEROME ROBINSON, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM AND ORDER DENYING DEFENDANT'S
## MOTIONS TO SUPPRESS STATEMENTS

This matter comes before the Court on a number of pretrial motions filed by the defendant Frank Jerome Robinson, including a Motion to Suppress Custodial Statements (Doc. 25) and Motion to Exclude Statements (Doc. 28). In the first motion, defendant moves to suppress statements he made during an interview with Detective Bryan Wheeles on August 8 and 9, 2007. In the second motion, defendant seeks suppression of statements made to Detective Brian Hill subsequent to his arrest on August 9, 2007. A hearing on defendant's motions was held on December 20, 2006, at which time the Court made oral rulings on several of the motions and took the motions to suppress under advisement. After reviewing the parties' filings and the evidence adduced at the hearing, the Court is now prepared to rule. For the reasons stated below, defendant's motions to suppress are denied.

**I.    Factual Background**

At 7:17 a.m. on August 8, 2006, the Topeka Fire Department responded to a fire at an apartment building located at 427 S.W. Tyler in Topeka, Kansas. The structure was a large Victorian home subdivided into four separate apartment units. To escape the fire, two occupants

in Apartment #3 jumped from a second story window. One of the occupants was not injured in the fall, but the other occupant fractured her pelvis and lower back after jumping from the second story of the home. A third occupant in that apartment was unable to escape and died in the fire. A body was recovered later that evening and was identified as Marvina Washington.

Upon examination of the scene, investigators determined that two fires had been intentionally set inside the building. Investigators interviewed the survivors of the fire and nearby residents and were given information indicating that defendant Frank Jerome Robinson was responsible for setting the fire. Throughout the day, investigators attempted to locate defendant but were unable to do so.

At approximately 11:30 p.m. on August 8, 2006, defendant arrived at the Topeka Police Department to speak with investigators.[1] Defendant knew about the fire, and he had known the victim, Marvina Washington, whom he referred to as "mom." Defendant was met in the lobby of police department by Detective Bryan Wheeles, who thanked him for coming and asked him if they could go into an interview room. Detective Wheeles, wearing plain clothes, then escorted defendant through the building to an interview room[2] that was equipped with an audio and visual recording system. The entire interview was recorded by this system.[3]

---

[1] Defendant's motivation for voluntarily coming to the Topeka Police Department is unclear. At the hearing, Detective Wheeles testified that defendant told him that he came to police department because he thought it was the right thing to do and that God told him that he needed to assist in the investigation. But this fact is not mentioned in Detective Wheeles' report nor in the transcript of the interview. In the transcript of the interview, defendant was asked several times by Detective Wheeles the reason for his coming to the police department that evening, and defendant responded that a man named Bernard had told him that the police wanted to talk to him. (Doc. 28 at 54, 59, 62.) Also in the transcript, defendant mentions his faith in God (*Id.* at 76, 77, 78), but never states that his motivation for coming to the police department was because God told him it the right thing to do.

[2] The interview room was approximately ten feet wide by ten feet long with a single door.

[3] A DVD recording of this interview was admitted into evidence at the December 20 hearing as Exhibit 1. A transcript of this recording was admitted as Exhibit MH401.

Detective Wheeles left defendant in the interview room for several minutes with the door closed. At 11:35 p.m., Detective Wheeles entered the room and began interviewing defendant. After asking defendant for his personal information, Detective Wheeles asked defendant to tell him what he knew about the fire at 427 S.W. Tyler. Defendant stated that he had been at the residence late in the evening of August 7 to buy crack cocaine, but that he left around 10:00 p.m. to go to another house at 10th and Polk Streets. Defendant stated that he stayed at that residence until the early morning of August 8, before he walked over to his girlfriend, Rebecca Clark's, apartment. Defendant told Detective Wheeles that he was with Ms. Clark at the time of the fire.

Simultaneous with defendant's interview, Detective Mike Barron was interviewing Ms. Clark in another interview room at the Topeka Police Department. During a break, Detective Barron informed Detective Wheeles that Ms. Clark was not corroborating defendant's alibi. Instead, Ms. Clark told Detective Barron that defendant had left her residence at approximately 4:00 a.m. and returned at approximately 10:00 a.m. and that she did not know where defendant was during this time.

Knowing that Ms. Clark was giving conflicting information to Detective Barron, Detective Wheeles pressed defendant for a more detailed time line of his whereabouts in the evening and early morning hours before the fire. The more that Detective Wheeles questioned defendant about his time line, the more agitated defendant became. Defendant explained that he was intoxicated at that time, and therefore he was not able to recall the specific details of his whereabouts.

At one point during the interview, Detective Wheeles brought into the room two

photographs. One photograph was a mugshot of Marvina Washington.[4] The other photograph was a picture of Ms. Washington's burned corpse taken at the crime scene.[5] Detective Wheeles stated in his report that his purpose in showing these photographs to defendant was to "play on his emotions." Detective Wheeles also knew that showing these photographs had an effect on defendant because when defendant saw the picture of Ms. Washington at the crime scene, it "rocked him back and he put it down on the table."

Defendant was never given *Miranda* warnings because, as Detective Wheeles testified, defendant was not under arrest. Detective Wheeles testified that defendant was told that he was not under arrest and that he could leave at any time. He further testified that defendant was never prevented from leaving the interview, and when defendant asked to leave, Detective Wheeles ended the interview. But defendant contends that at one point late in the interview, he tried to leave the room. After defendant was left alone in the room for some time with the door closed, he got up and started to the door where he was met by Detective Wheeles. Defendant stated that he needed some air, but Detective Wheeles led him back into the room. Detective Wheeles told defendant that he could "bounce out of here whenever we get done talking, but I think—I think you've—you've got some more stuff that we need to work through." Detective Wheeles continued by telling defendant, "you can bounce out of here whenever you want to, but I think there's some more stuff that we need to talk about, but you can do that." Defendant answered a few more of the detective's questions, and the interview ended shortly afterwards. During the entire interview, defendant never made any inculpatory statements to Detective

---

[4]This photograph was admitted at the hearing as Exhibit MH404.

[5]This photograph was admitted at the hearing as Exhibit MH405.

4

Wheeles about his involvement in the fire. On the contrary, defendant relayed that the Ms. Washington, who was blind, had repeatedly been victimized by the other occupants of the apartment.

The following day, federal agents executed a search warrant at an apartment where defendant had been staying. Detective Brian Hill and Detective Wheeles accompanied the agents to the apartment, arrested defendant, and removed him from the residence. Detective Hill was assigned to arrest defendant because they knew each other from a previous investigation in which defendant was a shooting victim. When Detective Hill entered the residence, he made contact with defendant and started making arrangements to transport him to the law enforcement center. Defendant asked Detective Hill what was going on, and he responded that defendant needed to come with him to the law enforcement center. When defendant told him that he had been interviewed at the law enforcement center the previous evening, Detective Hill responded that investigators had new information about the fire after talking to more witnesses. Defendant stated that he wanted to talk to Detective Hill about the fire, and Detective Hill told him that he wanted to hear what he had to say. Then defendant said, "It was an accident." Detective Hill responded to defendant that they could talk more at the law enforcement center.

Detective Wheeles testified that he did not hear any of this conversation in the apartment because he was making the arrangements for defendant's transportation to the law enforcement center. Both detectives testified that they did not want to interview defendant in the apartment. Instead, the detectives' goal was to take defendant to the law enforcement center so that defendant could be interviewed in one of the rooms with recording equipment that would document any statements made by defendant. Detective Hill testified that he made these

statements to defendant in the apartment in order to develop a rapport.

Detective Hill then escorted defendant out of the apartment and placed him in the front passenger seat of his police vehicle. Detective Wheeles joined them in the back seat of the vehicle. At this time, defendant was first read his *Miranda* rights by Detective Hill. Defendant stated that he understood his rights, but that he wanted to tell Detective Hill about the fire. Defendant stated that he went to 427 S.W. Tyler to purchase crack cocaine, that he was smoking crack cocaine at that residence and was "throwing matches," and that he may have "accidentally" set the fire. Defendant denied that he ran away from the scene of the fire, but he admitted that he might have been walking away quickly. Defendant also admitted that he had gotten into an argument with an occupant of the residence before the fire. Defendant acknowledged that he had set the fires at the residence, but continued to insist that the fires were accidental. Detective Wheeles noted that this story was a different version than what defendant had told him in the previous evening's interview. When they arrived at the law enforcement center, defendant was placed in an interview room. Detective Hill entered the room and advised defendant of his *Miranda* warnings for the second time. At that point, defendant invoked his right to counsel, and the interview ended.

## II.     Discussion

Defendant moves to suppress the statements made on two occasions: (1) during his interview at the law enforcement center with Detective Wheeles; and (2) during Detective Hill's arrest of defendant at the apartment where he was staying. In *Miranda v. Arizona*,[6] the Supreme Court held that a person in custody must be advised of his Fifth Amendment rights, including the

---

[6]384 U.S. 436 (1966).

right to remain silent, before being subjected to interrogation.[7] When an accused invokes the protections of *Miranda*, the government cannot use any evidence stemming from custodial interrogation unless the accused knowingly waives those rights.[8] For the *Miranda* safeguards to apply, (1) "the suspect must be in 'custody,' and [(2)] the questioning must meet the legal definition of 'interrogation.'"[9] Using this standard, the Court analyzes the two occasions that defendant made statements to investigators.

### A.   The Interview

The parties agree that defendant was "interrogated" during the interview with Detective Wheeles, but they dispute whether defendant was in "custody." A person is in "custody" when he has been arrested or his freedom is curtailed to a degree associated with a formal arrest.[10] The relevant inquiry for determining whether an individual is in "custody" is whether a reasonable person in that position would "believe [his] freedom of action had been curtailed to a 'degree associated with formal arrest.'"[11] "The determination of custody, from an examination of the totality of the circumstances, is necessarily fact intensive."[12] When making this determination, several factors should be taken into account, such as (1) whether the suspect is made aware he is free to refrain from answering questions and may end the interview; (2) the nature of the

---

[7] *Id.* at 479.

[8] *Id.*

[9] *United States v. Ritchie*, 35 F.3d 1477, 1485 (10th Cir. 1994) (quoting *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993)).

[10] *See Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam); *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam).

[11] *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993), *cert. denied*, 515 U.S. 1168 (1995) (quoting *Beheler*, 463 U.S. at 1125; *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)).

[12] *Griffin*, 7 F.3d at 1518.

questioning; and (3) whether the interview was conducted in a "police dominated" atmosphere.[13]

Based on the totality of the circumstances, the Court finds that defendant was not in "custody" because a reasonable person in his position would not have felt deprived of his freedom. Defendant voluntarily came to the law enforcement center and submitted to the interview with Detective Wheeles. Detective Wheeles testified that he told defendant that he was not under arrest and that he could leave at any time. Defendant was also never prevented from ending the interview. Toward the end of the interview, when defendant was left alone in the room with the door closed, defendant stood up and walked to the door. He was met at the door by Detective Wheeles, and defendant stated that he needed some air, but he did not ask to end the interview. To defendant's statement, Detective Wheeles replied that defendant could "bounce out of here whenever we get done talking, but I think—I think you've—you've got some more stuff that we need to work through." Detective Wheeles continued by telling defendant, "you can bounce out of here whenever you want to, but I think there's some more stuff that we need to talk about, but you can do that." While Detective Wheeles may have been encouraging defendant to stay in the room for more questioning, he ended his statement to defendant by telling him that could "bounce out of here" whenever he wanted. Based on these statements, a reasonable person would have felt free to end the interview, particularly when defendant initiated the interview by voluntarily coming to the law enforcement center to meet with investigators. Further, the interview ended shortly after defendant's statement that he needed air. Detective Wheeles escorted defendant out of the interview room, and defendant was

---

[13]*Id.* 1518–19.

allowed to leave the law enforcement center.[14]

Additionally, the nature of questioning was not so coercive that a reasonable person would have felt as if he was in custody. The initial tone of the interview was informal and relaxed. Detective Wheeles began the interview by asking defendant what he knew about the fire. For most of the interview, Detective Wheeles gathered information from defendant about the people who frequented the residence where the fire occurred. However, at certain times throughout the interview, defendant became agitated when he was pressed about his time line before the fire and when it was suggested that he may have been involved in the fire. Detective Wheeles also admitted to "playing on defendant's emotions," by showing him the photograph of Ms. Washington from the crime scene, but this personal psychological pressure did not amount to coercion so that defendant's free will was overborne.[15] Despite these few instances where defendant became agitated or emotional, the overall nature of the questioning did not create a coercive environment that would have caused a reasonable person to feel that he could not leave the interview.

Further, the questioning did not occur in a "police dominated" atmosphere. The interview did occur in a small room at the Topeka Police Department, but defendant voluntarily came to the law enforcement center and submitted to the interview. While defendant argues that the questioning was police-dominated, the interview was conducted by only one investigator,

---

[14]*See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (finding that defendant was not in custody when he came voluntarily to the police station, he was informed that he was not under arrest, and after a half-hour interview he was allowed to leave without hindrance).

[15]*See United States v. Glover*, 104 F.3d 1570, 1580 (10th Cir. 1997) (citing *Colorado v. Connelly*, 479 U.S. 157, 170 (1986) and holding that defendant's decision to cooperate with officers because she wanted to help her co-defendant and to be allowed to see him was not personal psychological pressure that amounted to official coercion).

Detective Wheeles, who was dressed in plain clothes.[16] Also, Detective Wheeles never used a weapon, handcuffs, or otherwise used force or threat of force in the interview.[17] Therefore, based on an examination of the totality of the circumstances, the Court finds that defendant was not in "custody" for purposes of *Miranda*. Accordingly, defendant's motion to suppress his statements made during the interview is denied.

Defendant also argues that his statements made to Detective Wheeles were involuntary, and therefore must be suppressed under 18 U.S.C. § 3501. The Court notes that this statutory provision applies to "confessions," defined under 18 U.S.C. § 3501(e) as "any confession of guilt of any criminal offense or any self-incriminating statement made or given orally or in writing." In this case, defendant never made any inculpatory statements during his interview with Detective Wheeles about his involvement in the fire. Rather, defendant made only exculpatory statements regarding his whereabouts in the hours leading up to the fire.[18] But even assuming that defendant's exculpatory statements were a "confession" under this statute, 18 U.S.C. § 3501 "applies only to confessions made during interrogation *following arrest or detention*."[19] 18 U.S.C. § 3501(d) provides:

> Nothing contained in this section shall bar the admission in

---

[16]*United States v. Benally*, 146 F.3d 1232, 1239 (10th Cir. 1998).

[17]*United States v. Richie*, 35 F.3d 1477, 1485 (10th Cir. 1994) (citing *United States v. Perdue*, 8 F.3d 1455, 1464 (10th Cir. 1993)).

[18]*See e.g., United States v. Gonzales*, 749 F.2d 1329, 1335 (9th Cir. 1984) (determining that 18 U.S.C. § 3501 was inapplicable when defendant's statements were basically exculpatory); *United States v. Torres*, 685 F.2d 921, 926 (5th Cir. 1982) (holding that because defendant's statement was not inculpatory, it was not a confession under 18 U.S.C. § 3501(e)).

[19]*United States v. Nelson*, 984 F. Supp. 1368, 1373 (D. Kan. 1997) (collecting cases that held that the procedural requirements of 18 U.S.C. § 3501do not apply when a defendant was not under arrest or detention at time the statement was made).

> evidence of any confession made or given voluntarily by any
> person to any other person without interrogation by anyone, or at
> any time at which the person who made or gave such confession
> was not under arrest or other detention.

Because the Court has determined that defendant was not in custody during his interview with Detective Wheeles, this statute is inapplicable to defendant's statements made during that interview when he was not under arrest or other detention at that time.

Defendant also argues that additional factors weigh in favor of finding that the statements were involuntary. In determining whether a statement is involuntary, the Tenth Circuit considers the following factors: (1) the age, intelligence, and education of the defendant; (2) the length of the detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subjected to physical punishment.[20] "The determination of voluntariness is based on the totality-of-the-circumstances; none of the single factors listed above is determinative."[21] After reviewing all of the factors, the Court concludes that defendant's statements were voluntary. Defendant was thirty-one years old at the time of the interview. While defendant contends that he is of limited intelligence because he was enrolled in special education classes in school, defendant's demeanor during the interview and his statements made to Detective Wheeles show that he understood the situation and that he was not subjected to coercion based on his limited intelligence. The length of detention was shortly over an hour. While the questioning began at 11:35 p.m. and continued until about 12:50 a.m., defendant never appears tired in the DVD recording of the interview.

---

[20] *United States v. Glover*, 104 F.3d 1570, 1579 (1997) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).

[21] *Id.* (citing *Schneckloth*, 412 U.S. at 226).

The nature of the questioning, as explained above, did not create a coercive environment as to render defendant's statements involuntary.  Defendant was not advised of his constitutional rights, but Detective Wheeles testified that he did not give *Miranda* warnings because defendant was not in custody.  Finally, defendant was never subjected to physical punishment.

Additionally, defendant points to other factors that he contends show that his "confession" was coerced.  Defendant was obviously upset emotionally because of his relationship with Ms. Washington, and Detective Wheeles admittedly played on defendant's emotions by showing him a photograph of Ms. Washington's burned corpse.  But as explained above, while these interrogation tactics may have been emotionally disturbing for defendant, the presentation of these photographs did not create a coercive environment.  Defendant also contends that, at the time of the interview, he was recently and admittedly under the influence of both drugs and alcohol.  Defendant was a known addict, which he contends made him more vulnerable to police interrogation.  However, based on the recording of the interview, defendant does not appear impaired or intimidated by the questioning so as to render his statements involuntary.  Based on all these circumstances, the Court concludes that defendant's statements made during the interview were voluntary, and therefore, defendant's motion to suppress these statements is denied.

### B. The Arrest

In contrast to the previous factual scenario, the parties agree that defendant was in "custody" when Detective Hill arrested defendant, but they dispute whether defendant was subjected to "interrogation."  For purposes of *Miranda*, interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally

attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."[22]  "Volunteered statements of any kind are not barred by the Fifth Amendment."[23]  Thus, absent a showing of coercion or other misconduct by law enforcement, an arrestee's volunteered statements made before receiving the *Miranda* warning may be used against him.[24]

In *Rhode Island v. Innis*, two police officers initiated a conversation in the presence of the defendant, who had been arrested as a suspect in a robbery investigation.[25]  The officers discussed their concern regarding the missing shotgun that was used in the robbery, and expressed their fear that a child might find the weapon and hurt himself.[26]  The defendant then interrupted the officers' conversation and directed them to the shotgun's location.[27]  In that case, the Supreme Court determined that the defendant was not "interrogated" within the meaning of *Miranda* because he was not expressly questioned by the officers and he was not subjected to the "functional equivalent" of questioning when there was no evidence that the officers should have known that their conversation was reasonably likely to elicit an incriminating response.[28]

Likewise, in this case, defendant was not subjected to either express questioning or the "functional equivalent" of questioning.  When Detective Hill arrested defendant, federal agents

---

[22]*Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

[23]*Miranda v. Arizona*, 384 U.S. 436, 478 (1966).

[24]*Innis*, 446 U.S. at 300–02.

[25]*Id.* at 294.

[26]*Id.* at 294–95.

[27]*Id.* at 295.

[28]*Id.* at 302.

13

were executing a search warrant in the apartment.  Detective Hill was responsible for making contact with the defendant, arresting him, and transporting him to the law enforcement center. Detective Hill testified that he had no intention of questioning defendant in the apartment, and that he wanted to interview defendant at the law enforcement center where any conversation could be recorded.  When Detective Hill made contact with defendant, he asked what was going on.  Detective Hill responded that defendant needed to come with him to the law enforcement center, but defendant replied that he had been there the previous evening.  Detective Hill stated that investigators had gathered new information from additional witnesses regarding the fire. Defendant then told Detective Hill that he wanted to talk to him about the fire.  Detective Hill replied to defendant that he wanted to hear what he had to say, and defendant stated, "It was an accident."

This entire conversation occurred as Detective Hill was arresting defendant and preparing him for transportation to the law enforcement center.  There is no evidence that Detective Hill should have known that his statement, "I want to hear what happened," was reasonably likely to elicit an incriminating response when they were in the process of leaving the apartment for the law enforcement center.  Detective Hill never asked defendant what happened, and he never suggested to defendant that the fire could have been an accident.  Further, Detective Hill did not seek clarification of defendant's statement by asking more questions or continuing the conversation.  Instead, Detective Hill followed up defendant's statement by telling him that they could talk more at the law enforcement center and ended the conversation.  This was not the functional equivalent of questioning, and therefore, defendant was not subjected to interrogation.

When defendant was placed into the police vehicle by Detective Hill, he was read his

*Miranda* rights.  Defendant stated that he understood his rights, but that he wanted to tell Detective Hill about the fire.[29]  Thereafter, defendant voluntarily gave incriminating statements during the ride to the law enforcement center.  Upon their arrival at the law enforcement center, defendant was advised of his *Miranda* rights for the second time.  He invoked his right to counsel, and the interview ended.  Although defendant invoked his right to counsel after he was read his rights for the second time, there is no evidence that defendant's *Miranda* rights were violated before that time.  Defendant voluntarily made statements to Detective Hill, and therefore defendant's motion to suppress these statements is denied.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's Motions to Suppress (Docs. 25, 28) are **DENIED**.

**IT IS FURTHER ORDERED THAT:**

(1) defendant's Motion for Discovery Schedule (Doc. 26) is **MOOT**;

(2) defendant's Motion to Exclude In-Court Identification (Doc. 27) and defendant's Motion for Discovery of Identification Evidence (Doc. 29) will be taken up as part of a *limine* hearing on **January 17, 2007 at 1:30 p.m.**;

(3) defendant's Motion for Notice of Evidence (Doc. 30) is **GRANTED**;

(4) defendant's Motion for Discovery Regarding Canine Accelerant Detection (Doc. 31) and Motion for *Daubert* Hearing Regarding Accelerant Detection (Doc. 34) are **MOOT**;

(5) defendant's Motion for *Daubert* Hearing Regarding Cause and Origin (Doc. 32) is

---

[29]The Court distinguishes the facts of this case from *Missouri v. Seibert*, 542 U.S. 600 (2004).  In that case, the Supreme Court held that *Miranda* warnings given during interrogation, after defendant gave an unwarned confession, were ineffective.  *Id.* at 613.  Accordingly, the defendant's post-warning statements were inadmissible.  *Id.* at 617.  In this case, the Court finds that defendant was not subjected to interrogation before the *Miranda* warnings were given.  Instead, defendant voluntarily made statements in the apartment before Detective Hill read defendant his *Miranda* rights in the police vehicle.

**GRANTED**; a hearing will be held **January 17, 2007 at 1:30 p.m.**; and

(6) defendant's Motion for Release of *Brady* Materials (Doc. 33) is **GRANTED**.

**IT IS FURTHER ORDERED** that the government shall be granted an extension of time for filing notice of its intent to seek the death penalty up to and including **January 29, 2007**; the government shall also provide defendant with the date of submission to the Capital Crimes Unit of the Department of Justice.

**IT IS SO ORDERED**.

Dated this 4th day of January 2007.

                                                  S/ Julie A. Robinson
                                                  Julie A. Robinson
                                                  United States District Judge